**Patrick CLEARY, Plaintiff,**

v.

**FEDERAL EXPRESS CORPORATION,
Defendant.**

No. 02–C–0821.

United States District Court,
E.D. Wisconsin.

April 14, 2004.

---

932

Mary E. Kennelly, Fox & Fox, Madison, WI, for Plaintiff.

Sally A. Piefer, Waukesha, WI, Carl K. Morrison, Memphis, TN, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Patrick Cleary, an employee of defendant, Federal Express Corporation, brings this action alleging that defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., by failing to reasonably accommodate his disability, epilepsy. Before me now is defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND

In 1990, plaintiff began working for defendant as a mechanic at the Milwaukee station ("station"), one of defendant's package handling facilities. Plaintiff was, in defendant's terminology, a non-DOT mechanic, i.e., one who did not need federal Department of Transportation ("DOT") certification. However, he subsequently obtained such certification and became, again in defendant's terminology, a DOT mechanic. Plaintiff worked second shift, and his job was to repair and maintain defendant's delivery trucks. As a mechanic, plaintiff was required to do some road testing of the vehicles that he worked on.

In November 1993, plaintiff was diagnosed with a brain tumor, underwent surgery and radiation therapy, and took a ninety-day disability leave, returning to work in February 1994. On September 13, 1994, defendant changed plaintiff's job designation from DOT mechanic to non-DOT mechanic because plaintiff was taking anti-seizure medication and could not pass the physical required for DOT certification. On September 22, plaintiff suffered a grand mal seizure. In October 1994, he was diagnosed with epilepsy and began receiving treatment for it. As part of his treatment, plaintiff was required to take anti-seizure medications three times a day. The side effects of the medication interfered with his sleep. Sleep deprivation is a factor that can lead to seizures.

While working second shift, plaintiff found it difficult to get adequate, uninterrupted sleep and, in the months after the grand mal seizure, experienced a number of auras or partial seizures. In April 1995, he asked defendant to transfer him to first shift and supported his request with a letter from his doctor stating that the transfer was medically advisable. Defendant's medical review office denied the request, stating that there was no "pressing

medical reason" to accommodate plaintiff's "preference" for working first shift. (Kennelly Aff. Ex. F.)

However, in May or June 1995, a first shift mechanic's position opened and plaintiff applied for and received the position. While working first shift, he was able to maintain a consistent sleep schedule and get adequate amounts of uninterrupted sleep, and he did not experience auras.

After suffering the grand mal seizure, plaintiff relinquished his Wisconsin commercial driver's license ("CDL"), but in June 1998, at the request of his supervisor Frank Zimmerman, he re-applied for the CDL and his license was reinstated with some restrictions.

In September 1998, Zimmerman changed the designation of plaintiff's position from non-DOT mechanic to DOT/CDL mechanic. Defendant states that it was obliged to make this change by the Federal Motor Carrier Safety Regulations ("FMCSRs"). In defendant's view, the FMCSRs required plaintiff to obtain DOT certification because he road tested commercial vehicles and an increasing percentage of the vehicles in its fleet fell into this category. Because of his epilepsy, plaintiff could not obtain DOT certification.

In April 1999, plaintiff's supervisors formulated an accommodation request on his behalf. Defendant's divisional human capital management committee recommended that plaintiff be allowed to continue working at the station and proposed that he use his CDL to road test vehicles on adjacent city streets within a five mile radius of the station. The committee understood that plaintiff wanted to continue to work first shift at the station for medical reasons related to his seizure disorder. However, defendant's corporate human capital management committee refused the accommodation request. Defendant did not communicate its refusal to plaintiff.

In July 1999, defendant advised plaintiff that he would have to obtain DOT certification in order to keep his position at the station. As stated, plaintiff could not obtain such certification.

On August 20, 1999, Zimmerman advised plaintiff that his ineligibility for DOT certification made it impossible for him to continue in his mechanic position at the station. He gave plaintiff the option of accepting a position as a third shift mechanic at the ramp, another of defendant's Milwaukee facilities, or taking a leave of absence and finding another position with the company within ninety days or be terminated. Plaintiff asked Zimmerman why he could not continue to work at the station, and Zimmerman responded that plaintiff could not do so because he was not DOT certified and had to road test vehicles. Plaintiff accepted the third shift position at the ramp because he did not want to be out of a job and believed that he had no alternative.

At the ramp, plaintiff worked from midnight until 8:30 a.m. While working such hours, he tried to get enough uninterrupted sleep during the day but was unable to do so. He states that he woke up too soon, and, because of his anxiety about not being able to sleep and being vulnerable to seizures, could not go back to sleep, and, as a result, became progressively more exhausted during the work week. He also states that while working third shift he began to have auras, which further increased his anxiety.

In March 2000, defendant offered plaintiff a first shift non-DOT mechanic position at one of its Chicago facilities. Plaintiff states that he declined the offer because he did not want to move away from his doctors and because he believed that commuting from his home in Waukesha to Chicago would prevent him from getting enough sleep.

Plaintiff continued to work third shift at the ramp, but on December 30, 2000, experienced another grand mal seizure, and in January 2001, was diagnosed with a recurrent brain tumor. On January 18, 2001, plaintiff underwent brain surgery and has been unable to work since then. He is presently on a long-term disability leave of absence.

Additional facts will be stated in the course of the decision.

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248, 106 S.Ct. 2505.

■ The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may satisfy its initial burden simply by pointing out that there is an absence of evidence supporting the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

### B.  Relevant ADA Provisions

■ The ADA prohibits an employer from discriminating against "a qualified individual with a disability" in connection with employment. 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A). The duty to reasonably

accommodate a disability requires an employer to "be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. Wis. Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995).

Under the ADA, a "qualified individual with a disability" is defined, in relevant part, as: "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Whether a plaintiff is a "qualified individual with a disability" involves a two-step determination. 29 C.F.R. § 1630.2(m); *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). First, the plaintiff must show that he "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* If the plaintiff makes this showing, he must then establish that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* Whether an individual is a "qualified individual with a disability" is determined as of the time of the employment decision. *Id.*

However, under the ADA, employers may only use "qualification standards ... that screen out or tend to screen out or otherwise deny a job benefit to an individual with a disability" if such standards are "job-related and consistent with business necessity, and ... performance

cannot be accomplished by reasonable accommodation." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (quoting § 12113(a)). Further, § 12112(b)(6) defines discrimination to include "using qualification standards ... that screen out or tend to screen out an individual with a disability ... unless the standard ... is shown to be job-related for the position in question and is consistent with business necessity." Finally, an employer has a defense to a charge of disability discrimination if it can show that the action challenged was "required or necessitated by another Federal law or regulation." 29 C.F.R. 1630.15(e).

## III. DISCUSSION

Plaintiff argues that defendant's refusal to permit him to continue to work as a first-shift mechanic at the station constituted a failure to reasonably accommodate his disability.[1] In order to survive defendant's summary judgment motion, plaintiff must demonstrate that a reasonable jury could find that he was disabled, that he was a qualified individual, and that by refusing to allow him to remain in his position, defendant failed to reasonably accommodate him. *See Baert*, 149 F.3d at 629. Defendant does not dispute that plaintiff was disabled.

The dispute between the parties centers on whether plaintiff was a qualified individual.[2] Defendant argues that plaintiff was not qualified to hold the position of DOT mechanic because he could not obtain

---

1. Initially, plaintiff also asserted a claim under the Rehabilitation Act of 1973 and a disparate treatment claim but has since abandoned such claims. Both parties treat plaintiff's claim as one of failure to reasonably accommodate under the ADA, which is how it is best understood. *See Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 628 n. 3 (7th Cir.1998).

2. Defendant also argues that summary judgment should be granted because plaintiff did not challenge DOT's decision not to certify him and, therefore, failed to exhaust administrative remedies. However, this argument is misplaced because plaintiff does not dispute that he was ineligible for DOT certification.

DOT certification. Defendant further asserts that it has a defense to plaintiff's discrimination charge because it was obliged by the FMCSRs to require DOT certification as a prerequisite to holding the position of mechanic at the station. *See* 29 C.F.R. 1630.15(c). This is so, according to defendant, because (1) it was an essential function of the position to road test commercial vehicles; (2) such road testing constituted driving in interstate commerce; and (3) the FMCSRs require that persons who drive in interstate commerce obtain DOT certification. In response, plaintiff argues that when he road tested vehicles at the station, he was not driving in interstate commerce and, therefore, defendant's prerequisite that he obtain DOT certification was neither required by the FMCSRs or job-related or consistent with business necessity. Therefore, plaintiff contends, he was a qualified individual.

I need only address whether the prerequisite of DOT certification was required by the FMCSRs, not whether it was job-related or consistent with business necessity. This is so because defendant justifies the prerequisite solely on the ground that the FMCSRs required it. According to defendant, it did not insist on DOT certification "merely of its own devising," *Albertson's, Inc.*, 527 U.S. at 570, 119 S.Ct. 2162, but because it was obliged to do so. Thus, I turn to the applicable FMCSRs and ask whether they required that plaintiff obtain DOT certification.

The FMCSRs apply to "employees" who "transport property or passengers in interstate commerce." 49 C.F.R. § 390.3. Thus, the FMCSRs apply only to employees who drive in interstate commerce. Therefore, the question of whether the FMCSRs required defendant to require plaintiff to obtain DOT certification depends on whether the road testing associated with plaintiff's position constituted driving in interstate commerce.

The FMCSRs define interstate and intrastate commerce as follows:

Interstate commerce means trade, traffic, or transportation in the United States—

(1) Between a place in a State and a place outside of such State (including a place outside of the United States);

(2) Between two places in a State through another State or a place outside of the United States; or

(3) Between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States.

Intrastate commerce means any trade, traffic, or transportation in any State which is not described in the term "interstate commerce."

49 C.F.R. § 390.5. The parties disagree as to what test I should apply to determine whether plaintiff was driving in interstate commerce. Defendant argues that I should look solely at the nature of its business. It further argues that because the essential nature of its enterprise was to transport cargo in interstate commerce, by the very fact of driving its vehicles, plaintiff should be regarded as having driven in interstate commerce. In contrast, plaintiff argues that to determine whether he, as an employee, drove in interstate commerce, I should focus on the particular kind of driving that he engaged in.

■ I agree with plaintiff and conclude that the question of whether the driving duties associated with his position involved driving in interstate commerce depends on the nature of the driving he was required to perform. Seventh Circuit case law supports this conclusion. In *Goldberg v. Faber Indus., Inc.*, 291 F.2d

232, 234–35 (7th Cir.1961), the Seventh Circuit stated that to decide whether a driver is "engaged in transporting property in interstate commerce" for the purposes of the Motor Carrier Act, a court must analyze the individual employee's activity not that of his employer. The court further stated that an employee driver operates in interstate commerce if his or her job involves or is likely to involve actually driving across state lines or driving intrastate routes that are part of "a through movement" of property that originated or was destined to move across state lines. *Id.* at 234. The court determined that the jobs of the drivers in question did not involve either duty, that the employees drove only routes that were genuinely intrastate and that there was no likelihood that they would ever be assigned to an interstate route, even temporarily. Thus, the employees did not drive in interstate commerce. *See also Chao v. First Class Coach Co.*, 214 F.Supp.2d 1263, 1271–76 (M.D.Fla.2001) (stating that notwithstanding employer's status, court must look at activities of individual driver); *Garcia v. Pace Suburban Bus Serv.*, 955 F.Supp. 75, 76–77 (N.D.Ill. 1996) (same); *Dole v. Circle "A" Constr., Inc.*, 738 F.Supp. 1313, 1317–19, 1321–22 (D.Idaho 1990) (stating that fact that some of employer's drivers were subject to the FMCSRs did not mean that all were).

Defendant argues that *Goldberg* is inapplicable because it arose in a context different from that of the present case, i.e., that of the Fair Labor Standards Act. However, I see no principled basis for distinguishing the question before the *Goldberg* court from that raised in the present case. Moreover, courts have reached conclusions similar to mine in cases raising the question presented here, namely, under what circumstances the FMCSRs apply to employee-drivers. *See, e.g., Tinjum v. Atl. Richfield Co.*, 109 Wash.App. 203, 205, 34 P.3d 855 (Wash.

App.2001) (stating that if driver's job involved transporting petroleum in solely intrastate commerce, employer would not have defense to handicap discrimination claim based on compliance with FMCSRs); *see also Frito–Lay, Inc. v. Wis. Labor & Indus. Review Comm'n*, 95 Wis.2d 395, 406–07, 290 N.W.2d 551 (Ct.App.1980) (rejecting defendant's contention that all of its drivers had to comply with DOT physical qualifications because defendant had interstate truck runs, the court noting that defendant also had some purely intrastate truck runs).

Additionally, my conclusion finds support in the DOT's Notice of Interpretation regarding its jurisdiction to regulate the qualifications and hours of commercial motor vehicle drivers under the Motor Carrier Act, 46 Fed.Reg. 37902 (July 23, 1981) ("Interpretation"). There, the DOT stated that its jurisdiction depended on "the activities or likely activities *of the individual driver,*" *id.* (emphasis added), and that it had jurisdiction if "in the regular course of employment a driver is, or could be, called upon to transport a shipment in interstate commerce," *id.* Thus, pursuant to the Interpretation, an employee is subject to DOT regulation if he or she has actually been assigned to drive interstate routes (routes either crossing state lines or within a state but part of through shipments of property across state lines) or if he or she "could reasonably have been expected to make one of the carrier's interstate runs." *Id.* However, DOT jurisdiction does not attach "if there is no possibility of the individual driver doing interstate driving or if the possibility of interstate driving is remote." *Id.*

The Interpretation is relevant to whether plaintiff's road-testing constitutes driving in interstate commerce because the 1997 Guidance, issued by the Federal Highway Administration ("FHWA"), an

agency within the DOT, regarding the applicability of the FMCSRs expressly refers to it. In addressing the scope of the FHWA's jurisdiction to regulate the qualifications and hours of drivers who operate "only occasionally" in interstate commerce, the Guidance adopted the Interpretation's "reasonable expectation" standard, i.e., whether a driver could reasonably be expected to drive "interstate". *See* 62 Fed. Reg. 16370, 16406, § 390.3, question 24 (April 4, 1997) (stating, in part, that "[i]f jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has operated in interstate commerce and that the driver could reasonably be expected to make one of the carrier's interstate runs").

In arguing that the nature of its business is the sole determinant of whether plaintiff was subject to the FMCSRs, defendant relies heavily on two cases, both of which are distinguishable from the present case. The first is one of my decisions, *Thoms v. ABF Freight Sys.,Inc.*, 31 F.Supp.2d 1119, 1122 (E.D.Wis.1998). In *Thoms,* I determined that notwithstanding that the plaintiff drove intrastate routes, a substantial amount of the cargo on board his vehicle originated outside the state and moved in interstate commerce. Contrary to defendant's argument *Thoms* did not turn on the nature of the employer's business but on the fact that the plaintiff's driving was part of a through movement of cargo across state lines. The present case differs from *Thoms* in that there is no indication that plaintiff ever transported cargo. Defendant also relies on *Murphy v. United Parcel Serv., Inc.,* 946 F.Supp. 872 (D.Kan.1996), *aff'd,* 141 F.3d 1185 (10th Cir.1998), *aff'd,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). However, *Murphy* is uninstructive because it does not address the question presented here, namely, under what circumstances an employee can be said to drive in interstate commerce.

Defendant argues that it is illogical and inconsistent with the intent of the FMCSRs for a commercial vehicle to be subject to federal regulations in some circumstances but not others. Again, I disagree. The question presented is not whether, on some occasions, a particular vehicle or vehicles were driven in interstate commerce, but whether the road testing associated with the position of mechanic constituted driving in interstate commerce.

Defendant also relies on the following language in the 1997 Guidance:

Question 5: Are personnel involved in road testing CMVs across a State line subject to the FMCSRs?

Guidance: Yes, any driver (including mechanics, technicians, driver trainees and other personnel) operating a CMV in interstate commerce must be in compliance with the FMCSRs.

Question 6: How does one distinguish between intra— and interstate commerce for the purposes of applicability of the FMCSRs?

Guidance: Interstate commerce is determined by the essential character of the movement, manifested by the shipper's fixed and persistent intent at the time of shipment, and is ascertained from all of the facts and circumstances surrounding the transportation. When the intent of the transportation being performed is interstate in nature, even when the route is within the boundaries of a single State, the driver and CMV are subject to the FMCSRs.

62 Fed.Reg. at 16404.

However, defendant's reliance is misplaced. The above language does not suggest that the nature of an enterprise is the sole determinant of whether an individual employee drives in interstate commerce.

The answer to question 5 could reasonably be read to mean that employees who road test vehicles without crossing state lines are not subject to the FMCSRs, and the answer to question 6 indicates that whether an employee drives in interstate commerce depends on a variety of factors.

■ The question of whether the FMCSRs applied to the position of mechanic at the station is a question of law to be decided by the court.[3] However, the answer depends on whether the road testing associated with the position constituted driving in interstate commerce which, as discussed, depends on the facts and circumstances surrounding the driving. The only evidence in the record concerning this issue is fleet manager Michael Laurain's testimony that, to the best of his knowledge, plaintiff never drove across state lines and never drove a vehicle that carried cargo. Thus, on the present record, a reasonable factfinder could not conclude that plaintiff drove in interstate commerce.

If plaintiff's duties did not include driving in interstate commerce, the FMCSRs did not require defendant to make DOT certification a prerequisite of his position. If defendant was not required to make such certification a prerequisite of his position, a reasonable jury could conclude that by refusing to permit him to continue in such position, defendant failed to reasonably accommodate his disability.

Therefore,

**IT IS ORDERED** that defendant's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that a telephone conference will be held on April 20, 2004 at 10:30 a.m. The court will initiate the call.

---

**3.** The Wisconsin Equal Rights Division mistakenly treated the issue as one of fact.