[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 12-14145

————————————————

D.C. Docket No. 2:11-cv-00006-UA-DNF

RICHARD SAMSON,

Plaintiff-Appellant,

versus

FEDERAL EXPRESS CORPORATION,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(March 26, 2014)

Before MARTIN and HILL, Circuit Judges, and HUCK,[*] District Judge.

---

[*] Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

HUCK, District Judge:

Appellant Richard Samson—a Type-1 insulin-dependent diabetic—appeals summary judgment for Appellee Federal Express Corporation on his disability discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and its Florida counterpart, the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.01, *et seq.*  In 2009, FedEx offered Samson, an experienced vehicle mechanic, a job as a Senior Global Vehicle Technician/DOT/CDL ("Technician") at its airport facility in Fort Myers, Florida. FedEx conditioned the offer on, among other things, Samson passing a Department of Transportation ("DOT") medical examination—which the Federal Motor Carrier Safety Regulations ("FMCSRs") require for commercial motor vehicle drivers who transport property or passengers in interstate commerce.  When Samson failed his DOT medical examination due to his diabetes, FedEx withdrew Samson's job offer since he did not qualify for the Technician position.  FedEx claimed that the FMCSRs required it to do so.

Samson then sued FedEx for disability discrimination.  The crux of Samson's claims was that "[i]n imposing a requirement that Samson must obtain a DOT [medical] card even though he would be a mechanic and not a commercial truck driver, FedEx violated the ADA [and the FCRA], which prohibit[] an employer from using qualification standards that screen out people with

2

disabilities." After discovery closed, FedEx moved for summary judgment. FedEx argued that Samson was not "qualified" for the Technician position because he failed his DOT medical examination; consequently, Samson could not perform the "essential function" of test-driving FedEx trucks "with or without reasonable accommodation." FedEx also contended that the FMCSRs provided a complete defense to Samson's claims because the regulations obliged FedEx to require a successful DOT medical examination as a prerequisite of the job. The district court agreed and granted summary judgment for FedEx on both grounds. However, because our *de novo* review of the record shows that summary judgment was improper, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

FedEx provides package delivery services nationwide. FedEx's aircraft transport packages from locations throughout the United States into and out of several Florida airports, including the Southwest Florida International Airport in Fort Myers, Florida. The packages are then unloaded from the aircraft, sorted for destination to various locations, and loaded onto FedEx tractor-trailers and straight trucks. These trucks then transport the packages to other FedEx facilities within Florida and, eventually, to recipients.

FedEx employs Technicians at its airport facilities to maintain, troubleshoot, and repair its trucks. On February 11, 2009, Samson—a vehicle mechanic with about twenty-nine years of experience—applied online for FedEx's sole Technician position at its Fort Myers airport facility. According to FedEx's online job description, "[t]he successful candidate will provide timely, quality maintenance for FedEx vehicle fleet and ground support equipment including preventative maintenance, troubleshooting, repairs modifications and documentation." The job description also listed the following requirements:

> High school diploma/GED. Four years recent fleet, automotive, or truck vehicle maintenance experience. Must possess applicable licenses or have vocational training. Knowledge of the use and operation of all automotive equipment and testing equipment gauges and tools normally associated with the troubleshooting and repair of hydraulic, gasoline and diesel automotive equipment. Possession of a complete set of hand tools including metric sizes. Must be able to lift and maneuver heavy vehicle components. Ability to work without supervision for extended time periods. Must possess a valid driver's license and be at least 21 years of age. *Must meet qualifications as outlined in section 391 of the Federal Motor Carrier Safety Regulations. Requires medical exam in accordance with FHWA or FAA regulations.* Must also have light to heavy truck experience*. Job offers are contingent upon successful completion of required examinations/checks for the particular position (e.g., drug screen, medical examinations in accordance with FHWA regulations, criminal record check, etc.).*

(emphasis added).

4

On March 10, 2009, after an interview, FedEx sent Samson—the best candidate—a letter offering him the Technician position. The letter, signed by Mahase Madoo, the District Fleet Manager, stated that "this job offer is contingent upon your successful completion of a DOT medical examination . . . and upon your receiving a Florida issued class A [commercial driver's license] within 90 days of your actual starting date in this position as required for this position." Samson signed the offer letter, accepting the position and its terms. At that time, Samson already held a Florida-issued Class B commercial driver's license.[1]

On March 11, 2009, Samson appeared for his DOT medical examination. During the examination, Samson disclosed to the medical examiner that he is a Type-1 insulin-dependent diabetic. Because insulin-dependent diabetics are automatically disqualified from being medically certified as physically qualified to operate a commercial motor vehicle in interstate commerce under the FMCSRs, absent an exemption, Samson failed his medical examination. *See* 49 C.F.R. § 391.41(b)(3) ("A person is physically qualified to drive a commercial motor

---

[1] The difference between a Class A and a Class B commercial driver's license under Florida law is that Class A drivers can lawfully operate "motor vehicle combinations," i.e. tractor-trailers, whereas Class B drivers cannot. *See* Fla. Stat. § 322.54(2)(a) ("Any person who drives a motor vehicle combination having a gross vehicle weight rating or gross vehicle weight of 26,001 pounds or more must possess a valid Class A driver license, if the gross vehicle weight rating or gross vehicle weight of the vehicle being towed is more than 10,000 pounds. . . ."); *id.* § 322.54(2)(b) ("Any person, except a person who possesses a valid Class A driver license, who drives a motor vehicle having a gross vehicle weight rating or gross vehicle weight of 26,001 pounds or more must possess a valid Class B driver license. . . .").

vehicle if that person . . . [h]as no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."); *see also id.* § 391.43(f) ("If insulin is necessary to control a diabetic driver's condition, the driver is not qualified to operate a commercial motor vehicle in interstate commerce.").

On March 16, 2009, Janet Johnson, a FedEx recruiter, emailed Madoo and others at FedEx asking whether they were legally obligated to inform Samson of the Federal Diabetes Exemption Program, *see* U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, http://www.fmcsa.dot.gov/rules-regulations/topics/medical/exemptions.htm (last visited Jan. 3, 2014):

> As mentioned, [Samson] applied for a DOT Sr. Global Vehicle Technician position in Fort Myers, Florida. After his DOT physical exam was completed on 3/12/09 he called me to say that he is on insulin and wanted to know if that was a problem. I said I would need to contact Memphis and would call him back. You and MRO mentioned a "Federal Diabetic Waiver". . . . Are we legally obligated to mention this waiver to him?

Two days later, FedEx sent Samson a letter withdrawing his job offer solely because he had failed his DOT medical examination. The next day, Samson emailed Madoo and John Durr, a FedEx Senior Manager, asking them to reconsider their decision. Samson wrote that he felt "discriminated against for being a diabetic" because he applied for a job as a Technician, not as an interstate

6

truck driver.  Samson also claims that he spoke with Madoo, who told him "we don't hire diabetics."  Madoo himself, however, is a Type-2 diabetic who treats his condition with insulin.

On April 2, 2009, Durr replied to Samson's email by explaining FedEx's belief that the FMCSRs required it to withdraw Samson's job offer after he failed his DOT medical examination:

> Our vehicle mechanic positions are governed under Federal DOT regulations since we operate in all 50 dates [sic].  It was the company's decision to be governed by Federal Guidelines rather than the various state regulations so we would not have to try and manage 50 sets of state regulations.  Unfortunately, Federal DOT Guidelines prohibit hiring anyone that is insulin dependent.

FedEx eventually hired John Rotundo—the second best candidate—for the Technician position.  During his approximately three years on the job, Rotundo has only test-driven FedEx trucks three times.  He has never driven one across state lines.  Nor has he ever driven one carrying cargo.  On one additional occasion, another FedEx employee drove while Rotundo sat in the passenger seat diagnosing the reported mechanical problem.

## II. ANALYSIS

Before us, Samson challenges the district court's grant of summary judgment for FedEx.  Samson first argues that the district court erred in concluding as a matter of law that he was not "qualified" for the Technician position because

7

he could not perform the alleged "essential function" of occasionally test-driving empty FedEx trucks in the Fort Myers area "with or without reasonable accommodation."

### A. Does a genuine factual dispute exist as to whether Samson was "qualified" for the Technician position?[2]

Under the ADA, no employer "shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis added); *see also* 29 C.F.R. § 1630.2(m).  To establish a prima facie case of disability discrimination, a plaintiff must show that he (1) is disabled,[3] (2) is a "qualified" individual, and (3) was subjected to unlawful discrimination because of his disability.  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).  Turning to the second element, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (emphasis added).  "Essential functions" are "the fundamental job duties of the employment position,"

---

[2] Because "disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims," *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007) (citation omitted), we review both claims together.

[3] The parties agree that Samson's diabetes is a covered disability.

8

but do "not include the marginal functions of the position."  29 C.F.R. §

1630.2(n)(1).

In reviewing the district court's summary judgment ruling *de novo*, the

threshold issue is whether a genuine factual dispute exists as to whether test-

driving FedEx trucks is an "essential function" of the Technician position.

Whether a particular job function is essential is "evaluated on a case-by-case basis

by examining a number of factors."  *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d

1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted); *see*

*also McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) ("[A] court

must conduct 'a fact-specific inquiry into both the employer's description of a job

and how the job is actually performed in practice.'") (citation omitted); *Keith v.*

*Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013) ("Whether a job function is

essential is a question of fact that is typically not suitable for resolution on a

motion for summary judgment.") (citation omitted).  Among the relevant factors is

"[t]he employer's judgment as to which functions are essential."  29 C.F.R. §

1630.2(n)(3)(i).  Although the employer's judgment is "entitled to substantial

weight in the calculus," this factor alone is not conclusive.  *Holly*, 492 F.3d at 1285

(internal quotation marks and citation omitted).  Because if it were conclusive:

> then an employer that did not wish to be *inconvenienced*
> by making a reasonable accommodation could, simply by
> asserting that the function is "essential," avoid the clear
> congressional    mandate    that    employers    "mak[e]

9

> reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity."

*Id.* (citing 42 U.S.C. § 12112(b)(5)(A)) (alteration in original).

Other relevant factors include:  any written job description prepared before advertising or interviewing applicants for the job; the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; the terms of any collective bargaining agreement; the work experience of past employees in the job; and the current work experience of employees in similar jobs.  29 C.F.R. § 1630.2(n)(3)(ii)–(vii).  There are also three non-exclusive bases on which a particular job function may be deemed essential: (1) the position exists to perform that function; (2) a limited number of employees are available among whom that job function can be distributed; and (3) the job function is "highly specialized" so that the incumbent is hired for their expertise or ability to perform that function.  *Id.* § 1630.2(n)(2).

Applied here, some of these factors support a finding that test-driving is an essential function of the Technician position.[4]  First, FedEx's judgment—which

---

[4] Several of the factors have little or no bearing on this case.  For instance, the record contains no evidence of any collective bargaining agreement.  A few other factors apply to some extent but are not very helpful.  The reason the position exists, for example, is not to test-drive FedEx trucks, but rather to provide timely, quality maintenance of FedEx's vehicle fleet.  Although test-

carries substantial weight—is that test-driving is an essential function of the job. Second, according to FedEx's written job description, Technicians maintain, troubleshoot, and repair FedEx trucks—responsibilities that conceivably could involve test-driving.  The job description also requires Technicians to possess a commercial driver's license and "have light to heavy truck experience."  Third, if Technicians did not conduct test-drives, it is reasonable to infer that there may be adverse consequences, such as failing to correctly diagnose a problem or assuming a problem was fixed when it was not.  This could lead FedEx to operating unroadworthy trucks, thereby endangering the public.  Fourth, the record suggests that test-driving may be a "highly specialized" job function, given that FedEx requires its Technicians to hold commercial driver's licenses and both federal and Florida law require commercial motor vehicle drivers to be licensed.

The remaining factors, however, weigh in favor of finding that test-driving is *not* an essential function of the Technician position.  First, although FedEx employs only one Technician at its airport facility in Fort Myers, there are nine other licensed truck drivers at that facility among whom the test-driving could be distributed.  In fact, Rotundo—the Technician hired instead of Samson—testified that, at least on one occasion, another employee test-drove while he sat in the

driving might be a part of that function, it does not follow that the Technician position "exists" to test-drive FedEx trucks.

11

passenger seat diagnosing the reported mechanical problem. Second, the amount of time that the incumbent Technician at the Fort Myers facility actually spends test-driving is miniscule. Indeed, Rotundo further testified that in the approximately three years he has been on the job, he has only test-driven FedEx trucks three times. If test-driving were such an essential function, as FedEx contends, one would expect it to be performed with regularity. Third, with respect to the current work experience of employees in similar jobs, the record shows that other FedEx Technicians throughout Florida generally test-drive an average of about 3.71 hours *per year*—an insignificant portion of their total time on the job.[5]

In sum, viewing all the record evidence and reasonable inferences in the light most favorable to Samson, as required, we conclude that reasonable jurors could differ as to whether test-driving FedEx trucks is an essential function of the Technician position.[6] *See Henschel v. Clare Cnty. Road Comm'n*, 737 F.3d 1017,

---

[5] While FedEx makes much ado about the "staggering 766 hours" that its Technicians throughout Florida test-drove commercial motor vehicles on Florida's public roadways over an approximately five year period, Samson undercuts this argument with basic math. To illustrate, FedEx states that from January 2007 through November 2011 forty-two different Technicians from thirty-nine different locations in Florida operated commercial motor vehicles on public roadways for a total of 766 hours and 6 minutes. While this statistic does not describe the type of vehicle driven, where it was driven, or why it was driven, it does show that each Technician only test-drove about 3.71 hours per year.

[6] FedEx urges us to adopt the district court's nonbinding opinion in *Murphy v. United Parcel Serv., Inc.*, 946 F. Supp. 872 (D. Kan. 1996) and conclude—as a matter of law—that test-driving is an essential function of *every* mechanic position with *every* package delivery company in the United States. This we will not do. Although the *Murphy* court concluded that test-driving was an essential function of the UPS mechanic position at issue there, it did so by relying on

1024 (6th Cir. 2013) (reversing summary judgment because genuine factual dispute existed as to whether hauling an excavator to the job site was an essential function of the excavator operator position where the relevant factors were in conflict). This issue, therefore, should not have been taken away from the jury and resolved as a matter of law.

## B. Do the FMCSRs afford FedEx a complete defense?

Assuming that test-driving is an essential function of the Technician position, Samson next challenges the district court's conclusion that the FMCSRs afforded FedEx a complete defense to his claims. As relevant here, disability discrimination includes when an employer uses "qualification standards . . . that screen out or tend to screen out an individual with a disability . . . unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). In addition, an employer may

---

speculation about how UPS mechanics *in general* could be "expected" to do their jobs, not on how the *specific* mechanic in that case actually did his job:

> It takes no stretch of the imagination to believe that a mechanic would be expected to check the efficacy of his repairs. One would generally expect a mechanic who has made repairs to the brakes of a commercial vehicle would road test his work product before returning the vehicle to the UPS delivery fleet. Similarly, delivering working and retrieving disabled vehicles does not strike the court as an aberrant expectation of an employer such as UPS.

*Id.* at 882–83. Because we must look to the specifics of the Technician position in determining whether—under the facts of this case—test-driving is an essential function of the job, the *Murphy* court's opinion about how UPS mechanics were generally expected to perform their jobs in that case is uninformative.

also have a defense to such a claim if it can show that the challenged qualification standard was "required or necessitated by another Federal law or regulation." 29 C.F.R. § 1630.15(e).

In this case, Samson claims that FedEx's medical examination requirement is an impermissible "qualification standard" because it screens out insulin-dependent diabetics. FedEx, however, maintains that it did not choose to impose the DOT medical examination requirement. Rather, FedEx insists that the FMCSRs required it to make DOT medical certification a prerequisite to holding the Technician position. This is so, according to FedEx, because: (a) the test-driving at issue here constitutes driving commercial motor vehicles over 26,001 pounds in interstate commerce under the FMCSRs; (b) the FMCSRs require employees who drive in interstate commerce, or who drive commercial motor vehicles over 26,001 pounds in either interstate or intrastate commerce, to obtain DOT medical certification; and (c) insulin-dependent diabetics are automatically disqualified from obtaining DOT medical certification under the FMCSRs, absent an exemption. Because FedEx justifies the DOT medical examination requirement solely on the ground that the FMCSRs mandate it—not that it was job-related or consistent with business necessity—we look to the FMCSRs to resolve this issue.

The FMCSRs—including the DOT medical examination requirement[7]—apply to "employers, employees, and commercial motor vehicles, *which transport property or passengers in interstate commerce*."[8]  49 C.F.R. § 390.3(a) (emphasis added).  In concluding that the medical examination requirement applies to Samson, both the district court and our dissenting colleague emphasize that FedEx is an employer operating in interstate commerce.  However, the Federal Highway Administration's guidelines interpreting § 390.3 make the important distinction that "intrastate drivers of an interstate motor carrier" are not subject to the FMCSRs except in one circumstance not applicable here.  Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 58 Fed. Reg. 60,734, 60,743 (Nov.

---

[7] The DOT medical examination requirement is contained in Part 391 of the FMCSRs, entitled "Qualifications of Drivers and Longer Combination Vehicle (LCV) Driver Instructors."  Part 391 establishes, among other things, "minimum qualifications for persons who drive commercial motor vehicles as, for, or on behalf of motor carriers."  49 C.F.R. § 391.1(a).  This includes being "medically certified as physically qualified" to operate a commercial motor vehicle, i.e., obtaining DOT medical certification.  *Id.* § 391.41(a)(1)(i).  A person cannot obtain DOT medical certification, however, if that person has an "established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."  *Id.* § 391.41(b)(3).

[8] "Interstate commerce" is defined as "trade, traffic, or transportation in the United States":

> (1) Between a place in a State and a place outside of such State (including a place outside of the United States);
>
> (2) Between two places in a State through another State or a place outside of the United States; or
>
> (3) Between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States.
>
> Intrastate commerce means any trade, traffic, or transportation in any State which is not described in the term "interstate commerce."

49 C.F.R. § 390.5.

17, 1993); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844–45, 104 S. Ct. 2778, 2782–83 (1984) (noting that courts should generally defer to an agency's interpretations of the regulations it promulgates).  In other words, our focus in this analysis must be on the particular position for which Samson applied, not on the nature of the employer's whole business.

Whether the FMCSRs obliged FedEx to require Samson to obtain DOT medical certification, therefore, hinges on whether the test-driving at issue constitutes transporting property or passengers in interstate commerce.  Because if it does constitute driving in interstate commerce, as FedEx contends, then the FMCSRs would oblige FedEx to require Samson to obtain DOT medical certification to be "qualified" for the Technician position.  If, however, the test-driving does *not* constitute driving in interstate commerce, as Samson contends, then the FMCSRs would *not* require FedEx to make DOT medical certification a prerequisite of the job; and, consequently, the FMCSRs would afford no defense to FedEx.[9]  *See Cleary v. Fed. Exp. Corp.*, 313 F. Supp. 2d 930, 939 (E.D. Wis. 2004)

---

[9] Below, FedEx misled the district court to mistakenly conclude that the FMCSRs afforded FedEx a complete defense as a result of FedEx's confusion over the proper applicability of the regulations.  As noted above, the DOT medical examination requirement contained in Part 391 of the FMCSRs applies to employees who "transport property or passengers in *interstate* commerce."  49 C.F.R. § 390.3(a) (emphasis added).  The commercial driver's license requirements in Part 383 of the FMCSRs, however, apply "to every person who operates a commercial motor vehicle . . . in *interstate or intrastate* commerce and to all employers of such persons."  *Id.* § 390.3(b) (emphasis added).  Yet, FedEx contended and the district court found that the FMCSRs obliged FedEx to require Samson to *first* obtain DOT medical certification

16

("If plaintiff's duties did not include driving in interstate commerce, the FMCSRs did not require [FedEx] to make DOT certification a prerequisite of his position."). Instead, FedEx's medical examination requirement would amount to an impermissible "qualification standard" that screens out insulin-dependent diabetics since FedEx has made no attempt to show that its medical examination requirement was job-related or consistent with business necessity.

Based on the record before us, we conclude that the test-driving at issue does *not* constitute transporting property or passengers in interstate commerce. Indeed, Rotundo—the incumbent Technician—has never test-driven any FedEx truck across state lines (not surprising given that the Fort Myers facility is located near

---

*before* he could obtain a commercial's driver license—regardless of whether Samson would be driving in interstate or intrastate commerce—because the position required operating commercial motor vehicles in excess of 26,001 pounds. *See Samson v. Fed. Exp. Corp.*, 874 F. Supp. 2d 1360, 1364 (M.D. Fla. 2012) ("In order to obtain a commercial driver's license, an operator must obtain a DOT Medical Certification, and must carry a current medical examiner's certificate that he or she is physically qualified to drive a commercial motor vehicle.") (citations omitted). But this is not necessarily so because, as Samson points out, Florida law expressly permits insulin-dependent diabetics to obtain commercial driver's licenses from the State—limited to driving in *intrastate* commerce—without having to obtain DOT medical certification:

> A person who is otherwise qualified as a driver under 49 C.F.R. part 391, *who operates a commercial motor vehicle in intrastate commerce only*, and who does not transport hazardous materials in amounts that require placarding pursuant to 49 C.F.R. part 172, *is exempt from the requirements of 49 C.F.R. part 391, subpart E, ss. 391.41(b)(3) and 391.43(e), relating to diabetes.*

Fla. Stat. § 316.302(2)(j) (emphasis added). This explains how Samson qualified for his Florida-issued Class B commercial driver's license, which he held at the time that he applied for the Technician position. And there is no support in the FMCSRs for FedEx's argument that the weight of the vehicle triggers the DOT medical examination requirement in Part 391 regardless of whether the vehicle is operated in interstate or intrastate commerce.

17

the Florida Gulf Coast far from any state line).  Nor has he ever test-driven any FedEx truck carrying cargo.  What's more, the Chief Counsel for the Federal Motor Carrier Safety Administration issued an opinion letter based on virtually identical hypothetical facts, opining that "[a] package vehicle carrying no cargo that is test driven by a mechanic for a few miles within the State of New York is operating in intrastate, not interstate commerce."  Letter from Alais L. M. Griffin, Chief Counsel for the Federal Motor Carrier Safety Administration, to Ronald G. Dunn, Partner at Gleason, Dunn, Walsh & O'Shea (July 29, 2011).  The Chief Counsel's opinion is also consistent with the district court's conclusion in *Cleary v. Federal Express Corporation*, a similar case on which Samson relies.  There, the district court concluded that since the plaintiff mechanic "never drove across state lines and never drove a vehicle that carried cargo," a reasonable juror "could not conclude that plaintiff drove in interstate commerce." [10]  *Cleary*, 313 F. Supp. 2d at

---

[10] The district court below attempted to distinguish *Cleary* in a footnote because it "involved commercial motor vehicles weighing 10,001 pounds, but less than 26,001 pounds" and, thus, "the regulations governing commercial driver's licenses were not at issue at *Cleary*." *Samson*, 874 F. Supp. 2d at 1370 n.10.  This, however, is a distinction without a difference.  The issue in *Cleary* was whether the DOT medical examination requirement applied to a mechanic position with FedEx in Wisconsin, similar to here.  While it is true that the regulations requiring commercial driver's licenses in Part 383 of the FMCSRs only apply to trucks weighing 26,001 pounds or more, the regulations requiring the DOT medical examination in Part 391 of the FMCSRs apply to any truck weighing 10,001 pounds or more that is driven in interstate commerce.  *See* 49 C.F.R. § 383.5 (defining "commercial motor vehicle" as used in Part 383 to mean "a motor vehicle or combination of motor vehicles used in commerce to transport passengers or property if the motor vehicle . . . [h]as a gross combination weight rating or gross combination weight of 11,794 kilograms or more (26,001 pounds or more)"); *id.* § 390.5 (defining "commercial motor vehicle" for purposes of the FMCSRs as "any self-propelled or

18

939; *cf. Thoms v. ABF Freight Sys., Inc.*, 31 F. Supp. 2d 1119, 1125 (E.D. Wis. 1998) (concluding that driver/dock laborer position did involve driving in interstate commerce because the job included delivering freight originating from out-of-state).

At bottom, we conclude that the occasional test-driving of empty FedEx trucks in the Fort Myers area does not constitute transporting property or passengers in interstate commerce. The FMCSRs, therefore, did not oblige FedEx to require Samson to obtain DOT medical certification to be "qualified" for the Technician position. By the same token, the FMCSRs do not afford FedEx a defense to Samson's disability discrimination claims. For these reasons, we reverse and remand this case to the district court for further proceedings consistent with this opinion, including determining whether summary judgment should be entered for Samson on his claims that FedEx's medical examination requirement is an impermissible qualification standard.[11]

---

towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle . . . [h]as a gross vehicle weight rating or gross combination weight rating . . . of 4,536 kg (10,001 pounds) or more"). Therefore, it is irrelevant that *Cleary* involved trucks weighing between 10,001 and 26,001 pounds, while this case involves trucks weighing 26,001 pounds or more. In both situations, if the employee's test-driving constitutes transporting property or passengers in interstate commerce, the DOT medical examination requirement applies.

[11] Although Samson argues that a genuine factual dispute exists as to whether the test-driving at issue constitutes driving in interstate commerce, based on the record on appeal, it may be

**REVERSED AND REMANDED.**

---

appropriate for the district court to resolve this issue as a matter of law.  *See Cleary*, 313 F. Supp. 2d at 939.

HILL, Circuit Judge, dissenting:

Under our *de novo* review, the district court correctly granted FedEx's motion for summary judgment as a matter of law.

The undisputed evidence establishes that, as a matter of law, appellant must hold a commercial driver's license (in order to test drive commercial motor vehicles), and pass a DOT medical examination, as both are essential functions of the technician position for which he applied.

The majority is misplaced when it bases its analysis on the individual **employee,** who may or may not operate commercial motor vehicles in interstate commerce.  The pertinent regulations apply to **employers** who operate commercial motor vehicles in interstate commerce.[1]

The majority errs when it relies on the fact that the technician position applied for was in Ft. Myers, far from the Georgia-Florida state line.  Therefore, in all probability, no test drive would ever approach interstate commerce.  But tell me, how far north must we go in the State of Florida for this line to start to blur and the possibility of interstate commercial travel to become more real?

---

[1] Indeed, if FedEx were to allow a technician to operate one of its commercial motor vehicles without a commercial driver's license and without a valid DOT medical certification, FedEx could be subject to both criminal and civil liabilities.

If a technician "rarely or ever" drove across state lines, would that mean the regulation would "rarely or ever" be violated?  Would the fact that a Ft. Myers technician "would likely never be" required to cross state lines, mean the regulation "would likely never be violated?"

For these reasons, the majority approach is flawed.  The appellant here cannot drive because he did not pass the physical exam.  FedEx correctly rescinded his conditional offer of employment.

The district court should be affirmed.